**D STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-180 (TNM)** |
| **v.** | : | |
| | : | |
| **TYLER BENSCH,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant, Tyler Bensch ("Bensch"), to 9 months of incarceration, 12 months of supervised release, 60 hours of community service, $500 restitution, and the mandatory assessment of $50 ($25 for each Class A misdemeanor). The Guidelines range as calculated by the government is 6 to 12 months imprisonment, and the government's recommendation is at the mid-point.

### I. Introduction

The defendant, Bensch, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election,

1

injured more than one hundred police officers, and resulted in more than 2.8 million dollars' worth of property damage[1].

Bensch pleaded guilty to one count of 18 U.S.C. § 1752 (a)(2), Disorderly Conduct in the Capitol Building, and 18 U.S.C. 641, Theft of Government Property. As explained below, a substantial jail sentence is appropriate in this case because (1) Bensch traveled to Washington, D.C. prior to January 6th with a militia group the "Three Percenters" aware of the possibility of violence; (2) Bensch wore a gas mask, tactical vest loaded with a chemical irritant spray, military attire, a helmet, and goggles to the United States Capitol indicating that he was prepared for violence; (3) the defendant saw violence prior to joining a group of rioters moving toward the Lower West Terrace Tunnel ("the Tunnel"); (4) upon arrival at the Tunnel, Bensch saw rioters throwing heavy objects into the Tunnel in an attack against police officers holding the line at the entry point to the Capitol erected in preparation for the Presidential Inauguration; (5) Bensch walked away from the violent scene at the U.S. Capitol with a stolen police shield; (6) and Bensch has shown little, if any, remorse for his actions.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that succeeded in halting the Congressional certification combined with the defendant's preparation for violence, his celebration and endorsement of the violence on that day, his lack of

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

remorse, and the potential for future violence renders a significant jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

The government refers the court to the stipulated Statement of Offense (Attachment A) in this case, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

***Defendant Bensch's Role in the January 6, 2021, Attack on the Capitol***

On January 5, 2021, Tyler Bensch traveled to Washington, D.C. with members of a militia group called the Guardians of Freedom ("GoF"). The group attended the rally that former President Donald Trump held on January 6, 2021. Following the rally, Bensch and several other members of the group, traveled in a military formation while on restricted grounds of the U.S. Capitol. *See* Image 1.



**Image 1**
(Screenshot of Government's Sentencing Exhibit 1 at 24 seconds)

3

While on the restricted grounds of the U.S. Capitol, Bensch wore a tactical vest with a patch associated with the "Three Percenters" Movement (i.e., "III") [2], and a black gas mask with a green filter. Bensch also strapped at least one chemical irritant canisters to the front of his tactical vest, wore a black radio and antennae, and mounted a GoPro style camera on his right shoulder.

At approximately 4:15 p.m. police officers held their ground inside the Tunnel as they protected the U.S. Capitol from breach by rioters. A mob of rioters in the mouth of the Tunnel began pushing in concert against the police officers. During his approach to the Tunnel, Bensch saw the violence occurring in the Tunnel and despite being in the midst of this violence, he continued to attempt to enter. *See* Image 2.

---

[2] According to the website of the Anti-Defamation League:

> Three Percenters are part of the militia movement, which supports the idea of a small number of dedicated "patriots" protecting Americans from government tyranny, just as the patriots of the American Revolution protected early Americans from British tyranny. The Three Percenter concept, created in 2008, is based on an inaccurate historical claim that only three percent of Americans fought in the Revolutionary War against the British. Three Percenters may join or form traditional militia groups but often form non-paramilitary groups or online networks. Many are not associated with any particular groups. The Three Percenter concept both contributed to and benefited from the resurgence of the militia movement that began in 2008.

https://www.adl.org/resources/backgrounder/three-percenters (visited June 22, 2023).



**Image 2**
(Screenshot of Government's Sentencing Exhibit 2 at 36 seconds,
Bensch is circled in red)

Bensch, and other members of his group, continued their approach to the Tunnel and joined other rioters who attempted to forcefully push through the United States Capitol Police (USCP) and Metropolitan Police Department (MPD) officers to gain access to the Capitol's interior. As the rioters gained momentum, Bensch can be seen with his hands on the rioter in front of him pushing into the Tunnel. *See* Image 3.



**Image 3**
(Screenshot of Government Sentencing Exhibit 3 at 3 minutes and 2 seconds,
Bensch is circled in red)

5

Bensch does not appear to have actually entered the Tunnel. The rioters were expelled from the Tunnel when the release of a spray caused the rioters to retreat and allowed law enforcement officers inside the Tunnel to regain ground. After being pushed from the entrance, Bensch turned around and moved away from the Tunnel. *See* Image 4.



**Image 4**
(Screenshot of Government Sentencing Exhibit 3 at 3 minutes and 42 seconds,
Bensch is circled in red)

While on U.S. Capitol Grounds, specifically the Lower West Terrace, Bensch also used a chemical spray in an act of violence against an unidentified individual, accused of being "Antifa," who posed no visible threat to Bensch.

As he was leaving the Tunnel, one of the other members of the group that Bensch was with, grabbed a police riot shield that was marked with the United States Capitol Police seal. At approximately 4:50 p.m., Bensch, and other members of the group, were observed on Capitol surveillance and open-source videos heading west, away from the Capitol building. In one video, Bensch was handed the police riot shield, from the member of the group that stole the riot shield on the Lower West Terrace, and then walked away from the U.S. Capitol building. *See* Image 5.



**Image 5 – Screenshot from Capitol Surveillance Video**

*Social Media Posts*

Following the events of January 6, 2021, Bensch has shown little, if any, remorse for his involvement in the events at the U.S. Capitol. Videos and images of Bensch in clothing similar to the clothing he wore on January 6, 2021, several images of Bensch with weapons and in military style training, and memes and other images minimizing or mocking the Capitol Riot have been posted to his Snapchat and Facebook accounts following January 6, 2021.  In a photo posted to his Snapchat account (yoitztylerrr) on January 8, 2021, Bensch is seen wearing very similar clothing to that which he wore on January 6, 2021, while he was on the U.S. Capitol Grounds. *See* Image 6.



**Image 6 – Snapchat post by Bensch on January 8, 2021**

On January 24, 2021, Bensch posted a video on Snapchat that zooms in on a "Danger, Armed Fascists in DC" poster that appears to have been posted online, a voice can be heard in the posted video saying "hey, that looks familiar" as the video zooms in on a person believed to be Bensch (circled in red in Image 6). *See* Image 7.



**Image 7**
(Screenshot of Government Sentencing Exhibit 4 at 0:00 seconds)

On August 30, 2021, Bensch posted the below image on his Facebook account (tyler.bensch.5494). *See* Image 8.



**Image 8 – Facebook post by Bensch on August 30, 2021**

In an audio file, which was also uploaded to his Snapchat account on January 27, 2021, a voice that appears to be that of Bensch can be heard saying "you see that's why I didn't join the marines, I would have picked infantry and then gotten assigned to be a fucking mailman, that's why I just joined a militia." (Government Sentencing Exhibit 5).

### *Bensch's Post-arrest Interview with the FBI*

Bensch admitted to being a member of GoF for some time before January 6, 2021, and that he got involved with them after meeting them at "flag waives[3]" and rallies. He stated that there was a sub-group within GOF called "B-Squad."  He stated that those within B-Squad were into training and firearms, and they were more "hands on first responders." He provided information about the leaders of B-Squad. He denied that GOF was a militia describing it as "not a militia…a group of

---

[3] Leading up to and following the 2020 election, Trump Supporters held flag waiving rallies, often themed as "Stop the Steal."  (https://flags4trump.com/)

constitutional conservatives…while wearing a 3% patch." He stated that B-Squad/GOF held several training events prior to the January 6, 2021 "Stop the Steal" rally. Bensch explained that these training events included firearms training, reloading, and hand-to-hand combat training. Bensch told agents that GOF raised money for and made plans to have a large group of people transported in several vans to travel from Florida to Washington D.C. for the "Stop the Steal" rally. GOF rented out the entire floor of a hotel and members did not need to pay money to attend the "Stop the Steal" rally.

### The Charges and Plea Agreement

On August 16, 2022, the United States charged Bensch by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2). On August 24, 2022, law enforcement officers arrested him at his home in Casselberry, Florida. On May 9, 2023, the United States charged Bensch by a two-count information with violating 18 U.S.C. § 1752(a)(2) and 18 U.S.C. § 641. *See* ECF 81. On July 7, 2023, pursuant to a plea agreement, Bensch is scheduled to plead guilty to Counts 1 and 2 of the Information. By plea agreement, Bensch will agree to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Bensch now faces sentencing on two misdemeanor counts: one for violating 18 U.S.C. § 1752(a)(2); and one for violating 18 U.S.C. § 641. As noted by the plea agreement, on each charge Bensch faces up to twelve months of imprisonment, a term of supervised release of not more than one year, and a fine of up to $100,000, and a mandatory special assessment of $25 for each misdemeanor conviction. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

10

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

In this case, a PSR has not been drafted by the U.S. Probation Office. The government has laid out a Sentencing Guidelines calculation in the plea letter dated June 28, 2023 (Attachment B). According to that plea letter, the parties agreed that Bensch's adjusted offense level under the Sentencing Guidelines is as follows:

**18 U.S.C. § 1752(a)(2)**

| | | | |
|---|---|---|---|
| U.S.S.G. **§ 2A2.4(a)** | Base Offense Level | | **<u>10</u>** |
| | | Total | **10** |

18 U.S.C. § 641

| | | | |
|---|---|---|---|
| U.S.S.G. **§ 2B1.1** | Base Offense Level | | **<u>6</u>** |
| | | Total | **6** |

In the plea letter, the parties further agree that two offenses do not group. *See* U.S.S.G. § 3D1.2. The offense level for the Section 1752 offense is the most serious, and it is counted as one unit. *See* U.S.S.G. § 3D1.4(a). The offense level for the 641 offense is 1-4 levels less serious, and it is counted as one unit. *See* U.S.S.G. § 3D1.4(a). Thus, two levels are added to the

group with the highest offense level—the 1752 offense—making the total combined offense level **12**. *See* U.S.S.G. § 3D1.4.

Finally, the Government agreed that a 2-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1

In accordance with the above, the Estimated Offense Level will be at least **10**.

Based upon the information now available to the United States Attorney's Office (including representations by the defense), Bensch has no criminal convictions. Accordingly, he is estimated to have zero criminal history points and his Criminal History Category is estimated to be I.  Based upon the Estimated Offense Level and the Estimated Criminal History Category set forth above, Bensch's estimated Sentencing Guidelines range is **6-12 months.**

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

V.      **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of nine months of incarceration.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Bensch's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Bensch, the absence of violent or destructive acts against the law enforcement officers is not a mitigating factor. Had Bensch engaged in such conduct, he would have faced additional criminal charges.

The most important factors to be considered in Bensch's case are that: (1) he traveled to Washington, D.C., and the United States Capitol, with a subgroup of the "Three Percenters" militia group, the "Guardians of Freedom; (2) his awareness of the possible violence at the Capitol on January 6 is shown by his military style of dress, including a tactical vest, helmet, and gas mask; (3) he saw violence in the Tunnel from a close vantage point, and instead of turning back continued toward the violence – and helped to push others towards the violence; (4) he carried chemical irritant spray when he was on U.S. Capitol Grounds and used this spray against another rioter; (5) he carried a police shield from the U.S. Capitol Grounds, even after seeing the violence on the Lower West Terrace and that law enforcement officers were being attacked – and needed the shields; (6) and finally, his lack of remorse for his actions. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

13

### B.  Bensch's History and Characteristics

A PSR was not drafted in this case. According to the information now available to the United States Attorney's Office (including representations by the defense), Bensch has no criminal convictions.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (Statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (Statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a nine-month term of incarceration.

Although Bensch pled guilty and is entitled to a two-point reduction for acceptance of responsibility, he does not appear to appreciate the full harm of his conduct.  Bensch made a calculated decision to approach the LWT Tunnel with other members of his militia group during a violent siege against police officers fighting to secure the entrance, and left carrying a police riot shield, which meant that one of those officers could not use it for their protection, and gratuitously

sprayed another individual present with a chemical irritant.  Furthermore, he has shown little, if any, remorse for his conduct in that his social media posts for months following January 6 show him posing in full military gear similar to the gear he wore to the attack on the Capitol.  A sufficient sentence of incarceration is necessary to provide specific deterrence against Bensch and to ensure he gets the message that participation in a riot and theft of property from police officers charged with protecting the seat of our federal government can never be justified or repeated.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Bensch based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022, Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (Statement of Judge Pan).

There are not many Capitol breach cases where the defendants are charged with misdemeanor offenses that also have the multiple aggravating factors that should be considered in this case. Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the *United States v. Williams (22-cr-265 (RC)),* case provides a suitable comparison to the relevant sentencing considerations in this case.

In *United States v. Williams (22-cr-265 (RC)),* Williams pled guilty to one count of violating 18 U.S.C. § 1752(a)(1) and one count of violating 18 U.S.C. § 641, both misdemeanors. Although the aggravating factors in *Williams* were different than in this case, in *Williams* there were several aggravating factors that were considered by the Court in determining the sentence, these factors included: (1) Williams having joined the riot early and rallying with the front lines of the mob of rioters as it assaulted the police line; (2) looting a U.S. Capitol Police officer's riot helmet and bag, and ultimately keeping possession of this equipment until after the entry of his guilty plea, and then lying to the FBI about stealing these items; (3)  joining a mob inside the Crypt as it pushed against a second police line; (4) and spending 35 minutes inside the U.S. Capitol building, including the suite of offices used by the Speaker of the House. Additionally, Williams, had an extensive criminal history which made the guidelines range in *Williams* higher than in this case. In *Williams,* the Government asked for 15 months of incarceration, a sentence at the midpoint of the 12 to 18 months Sentencing Guidelines range. Williams was ultimately sentenced to 6 months of incarceration, followed by 12 months of supervised release with 6 months of home confinement.

Additionally, there are many January 6 cases pending that are similar to Bensch's where individuals inside the LWT Tunnel, and directly outside the tunnel, engaged in a collective "heave ho" against police but did not directly assault police officers.  This Court recently sentenced Bernard Sirr and Luke Lints for their actions on January 6, including their conduct in the LWT Tunnel. It should be noted that in this case, Bensch did not enter into the LWT Tunnel as Sirr and Lints did. However, in this case, Bensch does have several aggravating factors that should be considered in his sentence that were not present in the Sirr and Lints cases.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 109V.

**VI.    Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Bensch must pay $500 in restitution, which reflects in part the role Bensch played in the riot on January 6.[6] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* The Government moves for Bensch's restitution payment to be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, also applies here since the offenses of conviction include theft of government property. *See* 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 9 months of incarceration, 12 months of supervised release, 60 hours of community service, $500 restitution, and the mandatory assessment of $50. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By: _____
HOLLY F. GROSSHANS
Assistant United States Attorney
D.C. Bar No. 90000361
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-6737
Email:  Holly.Grosshans@usdoj.gov

_____
Melanie L. Alsworth
Trial Attorney
U.S. Department of Justice
On detail to the USAO-DC
601 D Street, N.W.
Washington, DC 20530
Phone: (202) 598-2285
Email: melanie.alsworth2@usdoj.gov

## **CERTIFICATE OF SERVICE**

On this 5th day of July 2023, a copy of the foregoing was served upon all parties listed on

the Electronic Case Filing (ECF) System.


By: ___/s/ *Holly F. Grosshans*
HOLLY F. GROSSHANS
Assistant United States Attorney
D.C. Bar No. 90000361
U.S. Attorney's Office for the District
of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-6737
Email: Holly.Grosshans@usdoj.gov